**CALABRIAN CO., Inc., Plaintiff,**

v.

**BANGKOK BANK LTD., Defendant.**

No. 71–Civ. 2926.

United States District Court,
S. D. New York.

March 28, 1972.

Cichanowicz & Callan, New York City, for plaintiff by Francis H. McNamara, New York City, of counsel.

Patterson, Belknap & Webb, New York City, for defendant by Thomas Thacher, Joel Carr, Robert D. Sack, New York City, of counsel.

CROAKE, District Judge.

### MEMORANDUM

This action has been brought as a diversity action under 28 U.S.C. § 1332. Plaintiff Calabrian Co., Inc. ("Calabrian") is a New York commodities trading corporation registered in Thailand since

1964. Defendant Bangkok Bank, Ltd. ("the Bank") is a banking corporation organized and operating throughout Asia under the laws of the Kingdom of Thailand, with its headquarters in the city of Bangkok. Personal jurisdiction over the Bank was obtained by reason of its maintenance of a three-man representative office in New York City, established in 1965 for the purpose of liaison with United States correspondent banks.

The action involves allegations of breach of contractual relations entered into in Thailand on June 13, 1968, and to be performed primarily or exclusively in that country. For present purposes, both parties have presumed that it will be governed by the substantive law of Thailand. The present motion, under Rules 7(b) and 12(b), Fed.R.Civ.P., seeks dismissal of the action on grounds of the United States law of forum non conveniens, or, in the alternative, a stay pending the resolution of litigation now pending between the parties in Thailand.

The parties are in substantial agreement on the standard to be applied for determination of this motion in so far as it seeks dismissal for forum non conveniens. In fact, they have cited to the same formulation of the rule:

> "[A United States citizen's] election of [a United States federal court as a forum] should not be disregarded in the absence of persuasive evidence that the retention of jurisdiction will result in manifest injustice to the respondent. . . . The Saudades, 67 F.Supp. 820 (E.D.Pa.1946) [other citations omitted]." Mobil Tankers Co. S.A. v. Mene Grande Oil Co., 363 F.2d 611, 614 (3rd Cir.), cert. denied, 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966).

*See also* Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The task for the Court, then, is to analyze the facts of the transaction as they would affect the trial of the action either here or in the only alternate forum, namely, Bangkok, Thailand, and to determine whether injustice would actually result if jurisdiction were retained. Some factual development is therefore warranted.

## I

In 1967 the United States Agency for International Development ("AID"), a governmental instrumentality, agreed with Calabrian that it would be in the mutual interests of the United States, Calabrian, and Thailand, for Calabrian to establish a Thai subsidiary corporation which would construct grain handling facilities and operate a farmer assistance-grain trading program in Thailand, to be called Calabrian (Thailand) Company, Ltd. ("Calthai"). Calabrian originally owned most of the shares of Calthai, the remainder being owned by 23 individuals, predominantly Thai citizens. Initial financing for the project consisted of some equity capital from Calabrian, with the larger part of the capital coming from long-term loans from United States banks, payment being guaranteed by AID. Calabrian's Calthai stock was in turn pledged as collateral either for the loans themselves, or for the guarantees. The defendant Bank supplemented these funds by a 1968 loan of 21.5 million baht (U.S. $1,075,000, at 20 baht per $1.00), guaranteed by a mortgage on certain of Calthai's local grain processing and storage facilities located at Tha Rua, Thailand.

The parties soon saw Calthai's need for additional capital, and an instrument designated as an underwriting agreement was executed by Calabrian, Calthai, and the Bank. Under its alleged terms, Calabrian was to subscribe to a minimum of $1,660,000 of shares of Calthai "ordinary" stock, and to pay the proceeds to Calthai in Thailand. The Bank, in turn, agreed to underwrite $1,000,000 of "preference" stock of Calthai. Calthai, for its part, consented to increase its authorized capital to permit

the above transactions, and to effectuate certain operating efficiencies. The Bank accordingly established a subscription account in the full amount of the purchase price of the "preference" shares, and blocked that account pending receipt in Thailand of the purchase price of the "ordinary" shares. These shares were issued and apparently paid for, but allegedly only $500,000 of the subscription proceeds ever reached Thailand. Accordingly, the $1,000,000 subscription account remained blocked; the Bank did, however, grant a loan of $1,000,000 in order to permit Calthai to participate in the fall, 1968 harvesting season. This loan took the form of an overdraft credit conditioned on the use of the proceeds for the purchase of grain. It was apparently understood that upon receipt by Calthai of the remaining $1,160,000 in Bangkok, the Bank would apply the blocked subscription funds to retire whatever amount of the overdraft credit had actually been drawn down ($750,-000), and disburse the excess to Calthai. However, this never occurred, since the project, begun in early 1967, collapsed in late 1968, with Calabrian's default on an AID-guaranteed loan. As a result of that default, all parties attempted to salvage whatever was salvable from the unsuccessful venture.

Upon the occurrence of the default AID, the guarantor immediately moved to obtain control of Calthai by obtaining the collateralized stock. Meanwhile, Calthai brought an action in Thailand against the Bank asserting the breach of the underwriting agreement. When AID did obtain control of Calthai, this suit, as well as one by the Bank for the unpaid $750,000 overdraft, was settled. The Bank also foreclosed its mortgage on the Tha Rua grain facilities, although it alleges that they have proved inadequate as security.

Calabrian itself first initiated an arbitration proceeding against AID, contesting the justification for the takeover; the record is not before the Court (defendant cites it as The Calabrian Co., Inc. v. AID; AAA No. 16–10–0002–69; April 2–June 4, 1969), but defendant alleges that the unreported decision of the arbitrators was in favor of AID. Calabrian also brought suit, again in Thailand, as Calthai had when Calabrian controlled it, this time against the Bank and the three directors installed in the Calthai board by AID, apparently attempting to assert its right as purported major stockholder in Calthai to obtain the removal of the AID directorate for failure to observe Thai statutory formalities during the takeover. Calabrian asserts that the Bank is named as a party defendant solely in its capacity of corporate transfer agent for Calthai. No relief is sought against it. That action, then, is unconnected with the present one, except that both seek, by different means, to limit Calabrian's losses from the Calthai enterprise.

## II

The parties' research, plus the Court's own, has disclosed only two reported fact patterns in which a grant of dismissal against a United States citizen-plaintiff was approved. *Cf., e. g., Mobil Tankers Co., S. A., supra*; Hoffman v. Goberman, 420 F.2d 423 (3rd Cir. 1970) (dismissals reversed); De Sairigne v. Gould, 83 F.Supp. 270 (S.D.N.Y.1949), aff'd, 177 F.2d 515 (2d Cir.), cert. denied, 339 U.S. 912, 70 S.Ct. 571, 94 L. Ed. 1338 (plaintiff, an alien, defendant-movant, a United States citizen resident abroad). Both involved special situations: in Stewart v. Godoy-Sadan, 153 F.Supp. 544 (S.D.N.Y.1957), the action was brought by the executors of a decedent's estate based upon their testator's rights as a stockholder of a Cuban corporation, against a Cuban national. Virtually all considerations of relative convenience suggested Cuba as the better forum, and in addition, the action asserted the rights of a Cuban corporation in a derivative cause of action. There was therefore no justification for retaining jurisdiction.

Similarly, in Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956), the determining factor was that the action did not assert a transitory cause of action, but rather sought an adjudication of the validity of a Canadian trademark. The Court stated:

". . . we do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with the administrative and judicial officers of the Dominion of Canada." 234 F.2d at 647.

It is therefore possible to read this case as authority for discretionary dismissal, not on ground of forum non conveniens, but rather on the ground of comity. Ciprari v. Servicos Aereos Cruzeiro do Sul, S. A., 232 F.Supp. 433, 442–444 (S. D.N.Y.1964).

█ The burden upon the defendant in establishing to this Court's satisfaction that injustice will inevitably result from the trial here of plaintiff's concededly transitory cause of action can therefore be seen to be substantial, indeed. This is in part because the federal courts, as all courts must, start their analyses of 28 U.S.C. § 1332 questions with the proposition that the jurisdiction conferred upon them, whether by Congress or the Constitution, was meant to be exercised wherever practicable. United States courts are also generally of the opinion that they have proved over the years to be as capable as any courts to resolve complicated controversies, and as interested in obtaining justice. In this light, this Court has no difficulty in finding itself capable of exercising its jurisdiction without manifest injustice to either party. Some inconvenience may result; this will be mitigated as much as possible within the framework of the civil rules, but the action will not be dismissed.

The first factor relied upon by defendant in support of its motion for dismissal is the alleged inconvenience and expense of trial in the United States. It is alleged that most, although concededly not all, of the witnesses will have to be transported from Bangkok, at a cost of approximately $1,300 per round-trip air fare, plus the inconveniences of travel and of time lost from work (the round-trip flight time, not including ground transportation to and from the airports and time spent awaiting connections, is 44 hours). The expenses of New York lodging will also be considerable. In addition, the fees charged by New York counsel are alleged to be considerably in excess of those of their Bangkok counterparts. Finally, a predominant amount of the documentary evidence, although again concededly not all, is allegedly located in Bangkok, and some of it is in the Thai language. However, the contract which forms the basis of the suit, the underwriting agreement, was admittedly negotiated and drafted in English. Also, certain other witnesses —some of the plaintiff's own employees, as well as at least some of the AID employees, and their documents—are presumptively located in this country.

The damages claimed on this action amount to $10,000,000 as of the date of filing of the complaint. This may reflect an understandable plaintiff's optimism, but it seems apparent that very large sums of money are involved. The expenses alluded to above, when viewed in comparison with the stakes involved and the evident resources of the parties, see Fiorenza v. United States Steel Int'l Ltd., 311 F.Supp. 117 (S.D.N.Y.1969), are not so great as to amount to injustice, as opposed to mere inconvenience. That inconvenience can be minimized by providing that the expenses of transportation of defendant's witnesses shall become a taxable cost of the action, or by other such action within the discretion of the trial court. See Fiorenza, supra, 311 F.Supp. at 121.

■ The alternative, were the action dismissed, would be to force the plaintiff to incur similar inconvenience before the Thai court. In this regard it appears that the expense of pre-trial discovery in Thailand would be substantially less than here, but the expense of the hearings and trial potentially greater, since the Thai courts apparently subsume our pre-trial procedures into their in-court factfinding. There are facilities in this city for translation of documents from the Thai; most of the witnesses apparently speak English. If the translation facilities are inaccurate or excessively expensive, alternate arrangements can be developed. Even assuming that the cost to defendant of trial here, reduced as much as possible, will exceed the costs the parties would incur in trying the action in Thailand, the conclusion must be that this factor, standing alone, is clearly insufficient justification for the drastic remedy of dismissal.

■ Defendant's second factor urged in support of this motion is that the action, although not denominated as such, is actually a derivative action, and therefore falls within the exception to the general rule carved by Stewart v. Godoy-Sadan, *supra*. The difficulty here is that the plaintiff was a party to the contract upon which it sues. Its status as stockholder of Calthai may well be relevant to establishment of damages, *see infra*, but does not operate to prevent plaintiff from suing in its own right on the contract now in suit.

The third factor asserted is the procedural difficulty in conducting a trial in this district. Defendant claims that certain of its witnesses may not be amenable to compulsory process of this Court, and that the Thai courts may be unwilling to issue their process for compulsion of attendance at pre-trial proceedings which are alien to Thai jurisprudence. It also asserts that pre-trial discovery in Thailand will be expensive and complicated by the alleged absence of local stenographic court reporters. Finally, production of documents will allegedly be complicated by the Thai rule that documents and records in pending court proceedings are confidential.

■ Most of defendant's allegations in this regard are purely conclusory, without evidentiary support. The relative amenability of witnesses to process for attendance at a United States as opposed to a Thai trial, and the availability of competent reporters, are at present purely speculative questions. The cost of pre-trial discovery in Thailand is a factor to be weighed, but the expense involved is not unjust as compared to probable trial expense in Thailand, the size of the action, and the resources of the parties. It should also be remembered that this Court possesses considerable ameliorative resources of its own. *See* Rules 26(c), 37(e), Fed.R.Civ.P.; 28 U.S.C. § 1783. The pre-trial burdens alleged are at most inconvenient, but not onerous to the point of injustice.

Defendant finally claims that it would be such a burden for this Court to resolve a case governed by Thai law, both codified (in Thai and in an official English translation) and customary, that the Court should renounce the attempt. However, this is a matter of inconvenience, if at all, to the Court, and perhaps to plaintiff, which might well have the heavier burden under Rule 44.1, Fed.R. Civ.P. That rule gives the Court ample discretion to minimize the inconvenience and expense to defendant; it also casts doubt upon the continued vitality of Walton v. Arabian American Oil Co., 233 F.2d 541 (2d Cir.). cert. denied, 352 U. S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956), relied upon by defendant. *Cf.* First National Bank of Arizona v. British Petroleum Co., 324 F.Supp. 1348, 1357, 1361 (S.D.N.Y.1971)

In summary, it appears that all the factors cited by defendant, taken not only singly but also in concert, are insufficient evidence of the possibility of injustice from maintenance of this action in this Court. This being the case, it is not necessary to engage in any ex-

tended analysis of the impartiality vel non of the Bangkok tribunal. See Article II(2) of the Treaty of Amity and Economic Relations, May 29, 1966, [1968] 19 U.S.T. 5844, T.I.A.S. No. 6540.

### III

Defendant's alternative request is for a stay of this action pending resolution of the presently pending litigation in Thailand, Black Case No. 797/2512 (the year 1968 in the Western Calendar is 2512 in the Thai calendar), in the Civil Court of Bangkok. Plaintiff opposes this primarily on the ground that such a stay would possibly be for as long as six years, the time it is alleged, in a purely conclusory manner, it might take for a final resolution of the Thai action, and that such a delay in the adjudication of the rights alleged in the present action is a substantial prejudice not counterbalanced by any other factors.

This is insufficient. The factors in support of a stay are substantial and persuasive. The Thai litigation was initiated by present plaintiff, and arose, as did the present action, out of plaintiff's activities in Thailand. It apparently involves the activities of the parties, and AID, after the occurrence of the alleged breach of the contract in suit herein; proof of these same facts will be essential to determination with any accuracy of the damages actually suffered as a result of the alleged breach. Under Thai law, those records will apparently remain totally unavailable until the end of that action. Since plaintiff created this situation by initiating the Thai action, and since the records in question will most probably be relevant to defendant's case in mitigation of damages, should it be put to such proof, it seems only reasonable that plaintiff should bear the burden of any inconvenience resulting from the situation it has created. The alternative would be considerable prejudice, if not actual injustice, to defendant.

Furthermore, it is claimed that the Thai action will result in a determination of a fact issue concerning plaintiff's damages, which would otherwise have to be tried in the present action. Plaintiff seeks damages herein for loss of good will and also for diminution in the value of its equity in Calthai. Defendant avers that the ownership of Calthai is a question which will be resolved in the Thai action, and therefore, that it be allowed to proceed first, the issue will not have to be tried twice. The issue is alleged to be relevant to the general question of whether plaintiff in fact possesses any equity which defendant's acts could have diminished. Plaintiff, on the other hand, claims that the Thai action involves nothing more than the construction and application of a local statute. The parties have not addressed themselves to the binding or persuasive effect of any factual determination by Thailand upon this Court's determination of the issues.

It is impossible accurately to predict the effect of a prior Thai adjudication on the basis of the present record, which (understandably) does not contain any records of the Thai action. But even the possibility of a determination which would substantially moot the present action is an additional factor worth considering. On balance, it is our opinion that plaintiff should be held to abide the resolution of relevant litigation which it itself inaugurated.

Accordingly, the Court declines to dismiss the action. In the interests of justice, and judicial economy, it will stay the present action pending adjudication of Black Case No. 797/2512, in Thailand. In this regard plaintiff's offer to dismiss the action as against defendant only, but not in its entirety, is rejected as insufficient. Should further developments render the stay unnecessary or inequitable, suitable application may of course be made.

So ordered.